### FIRTH-STERLING STEEL CO. v. BETHLEHEM STEEL CO.

(District Court, E. D. Pennsylvania. September 10, 1914.)

#### No. 431.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—PROJECTILE.

The Davis patent, No. 945,492, for an armor piercing projectile having in combination (1) a cavity for the required quantity of explosive, (2) the shape to most readily pierce, (3) the support of a nose of soft metal covering and surrounding the penetrating point so as to make its power effective, (4) a shell or cap over the forward end of the projectile to give the contour for prolonged flight, and (5) a cavity or air space in this shell in front of the soft nose of the projectile, so that the operation of the latter may not be hindered, *held* to disclose patentable novelty and invention, and also infringed.

2. PATENTS (§§ 283, 317*)—SUIT FOR INFRINGEMENT—INJUNCTION—MANUFACTURES FOR UNITED STATES.

While the fact that an infringer of a patent for a projectile has contracted to manufacture the infringing projectile for the United States is no defense to a suit for the infringement, an injunction restraining the same may properly except from its operation the performance of such contract and the entering into and performance of like contracts with the government, leaving to complainant, as to such infringements, its remedy on an accounting.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 448–450, 452, 559–565; Dec. Dig. §§ 283, 317.*]

3. PATENTS (§ 1*)—CONSTRUCTION AND OPERATION—INVENTIONS USED BY UNITED STATES.

The patent laws cannot be so limited by the courts as to exclude from their protection inventions which the United States may desire to use.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 1; Dec. Dig. § 1.*]

In Equity. Suit by the Firth-Sterling Steel Company against the Bethlehem Steel Company. On final hearing. Decree for complainant. See, also, 199 Fed. 353.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Melville Church, of Washington, D. C., for plaintiff.

James A. Watson, of Washington, D. C., for defendant.

Francis Fisher Kane, U. S. Atty., of Philadelphia, Pa., for the United States.

DICKINSON, District Judge. [1] The decision of this suit involves mainly the validity of the patent issued January 4, 1910, following application filed April 21, 1908. The letters patent were granted to Cleland Davis, and are now owned by the plaintiff by assignment. The number of the letters patent is 945,492. There is no serious question of infringement. The real defense is lack of novelty; all the features of the claimed invention having been anticipated in the prior art. The general claim of invention is for an improvement in projectiles. The type of projectile involved in the present discussion is the armor piercing projectile. If the doctrine that preparedness for war is a preservative of peace holds good, the inventive genius of the nation should be given every stimulus to apply itself in the direction here indicated. At the present time added emphasis is given to the concern which all feel in the success which may attend such efforts. The history of the development of the art is in itself not uninteresting, and throws light upon the points in controversy.

The contest between armor piercing projectile producers and armor plate manufacturers is an approach to the old one between resistless force and immobility. The advances made by the armor plate makers made the task of the projectile designer include the achieving of two necessary results. The projectile must both reach the plate and pierce it. It must reach it to pierce it, and must therefore have the property of long flight. It must pierce it when reached, and must therefore be given the greatest possible power of penetration. Failure in one rendered futile success in the other. The property of prolonged flight was early found in contour of form. Whether this was due to inducing the projectile to take the trajectory of longest flight, or to the reduction of air resistance, or to both, the practical result was empirically discovered and universally accepted. The proper contour was found and could be reproduced at will. The problem of securing the greatest power of penetration presented a dual aspect in finding a practical method of solution. The obvious and necessary resort to a fine sharp point encountered an obstacle to its success in that the hardened surface given to the armor turned aside, upset, or broke the point of the projectile.

Passing by for the present the advantages of the use of ductile or frangible metal in the substituted means attempted to be used to protect the point of the projectile, this was accomplished by means of the Johnson device. The sought for result was accomplished by what may be described, in a general way, as jacketing the point of the projectile in other metal. The inquiry whether the success is due to the lateral support given to the point or to what would seem to be in effect the same thing, the "radial inertia" of the enveloping metal being greater than its tensile strength, to the depressing of the plate an instant before the point is in contact or to the enveloping metal

making smooth the entrance of the projectile, may also be passed in this preliminary statement. We have the fact of a successful result. To recapitulate these results, we had the contour of shape for length of flight known. We had also the property of fullest penetration secured. We had, however, no practical combined result, because the use of one of these known things was either to prevent or render futile the use of the other. No effective shot could as yet be fired, because, if the flight contour was given the projectile, it would reach the mark, but would not do its work when there, and, if the penetrating device was employed, it could not do its appointed task because it would not reach its mark. To get over this dilemma, resort was had to the thought which would seem to lie on the surface of the problem. The flight contour and the penetrating form, although alike essential and required to be both potentially existing in the projectile when inserted in the gun, did not function simultaneously but successively. The one began where the other ended. The contour of flight had accomplished its appointed work when the mark was reached. It was not until then that the penetrating construction began its work. If, therefore, a temporary flight form could be given the surface contour of the projectile, which would inhere until the mark was reached, and would then be automatically discarded to make way for the penetrating form, the problem would be solved. This would seem not difficult to accomplish. There were two seemingly obvious means of its accomplishment. The one was to give to the enveloping metal, which made the penetration effective, the form contour, which lengthened the flight. The other was to supply the contour of flight form by means of a hollow enveloping cap or casing, which would be destroyed on impact. The seemingly obvious, however, is seldom true. Devices to accomplish the required result were tried, and the problem remained still unsolved. The causes of the failures we need not now discuss. They are referred to in connection with the special findings submitted herewith. The solution was finally found in the device which embodies the claims of the patent in suit. That it was at once attended with commercial success is undoubted. The failure of the solid form of point encasing metal was avoided by abandoning its use. The cap which failed was one which inclosed the naked point of the projectile proper. Its failure was escaped by the simple expedient of retaining the soft metal nose feature within an enveloping shell or cap having the required flight contour. Success was achieved by making a complete projectile, which consisted of the projectile proper having a cavity space for sufficient explosives to propel it, a sharp point from which a soft metal nose or protuberance protruded, so as to assure penetration, and all this fitted into a shell or cap having the required contour to give prolonged flight, and a cavity or air chamber in front of the soft metal nose, so that the cap would perform its proper function without interfering with the penetrating function of the sharp point of the projectile and the enveloping metal. This design had inventive merit, and was, as has been said, a commercial success. Its merit is in a happy combination, which produced the required result. It is easier to be sure of this than to state in

just what the novelty of the combination consists, because the device is of such supreme simplicity. It stood the supreme test of merit and of novelty, however, in that it did what had not before been accomplished.

This brings it well within the established principle that the patentable novelty of a combination is not denied by proof that all its elements, taken separately, are old. Hailes v. Van Wormer, 87 U. S. 353, 22 L. Ed. 241. In what this combination results, the useful purposes accomplished by it, and of what the combination consists may be thus summarized:

(1) It produces an improved effective armor piercing projectile.

(2) This projectile is given the characteristics of both the greatest length of flight and power of penetration by a method not before known of combining in one projectile the presence of (a) the contour of form productive of length of flight; (b) the sharpness of point to facilitate penetration; (c) the support of the point to give it strength as well as sharpness; (d) an arrangement and construction of the several parts, so that the use of one does not forbid the use of the others nor the functioning of one lessen the efficiency of the others.

(3) The embodied design consists of an armored piercing projectile (a) having a cavity for the required quantity of explosives; (b) having the shape to most readily penetrate; (c) having the support of a nose of soft metal covering and surrounding the penetrating point so as to make its power effective; (d) having a shell or cap over the forward end of the projectile, so as to give it contour of prolonged flight; (e) having a cavity or air space in this shell in front of the soft nose of the projectile, so that the operation of the latter may not be hindered.

It would give undue length to this opinion to do more than state the general conclusions reached. We have accompanied the special findings of fact and conclusions of law filed herewith with some discussion of the grounds of defense raised in this case. The general conclusions reached are that the patent in suit is valid; that the proprietary right of the plaintiff therein has been infringed by the defendant; and that the plaintiff is entitled to the usual decrees for an injunction and accounting and for costs.

[2] There is one modification, however, which should be made in the award of an injunction. The defendant is manufacturing projectiles under a contract with the United States, who have been admitted to intervene in this proceeding. The government is properly concerned only with the fulfillment of that contract.

[3] We do not concede the right of the United States to maintain the further positions taken. They go in effect to the length of denying the extension of the patent laws to inventions for which the government may have use. Congress alone, and not the courts, can so limit them. The United States, considered as an individual as well as its citizenship as a whole, is concerned with the policy of stimulating the inventive genius of its people to the limit of their abilities. No real benefit is ever gained by withholding from any one his just rights. The remedies he is given are both legal and equitable. The

former is of right; the latter of grace. The legal remedy is to accord him proper compensation for any use made of his property. This does not deprive the government of the use of any invention which may be demanded by the public needs. It merely accords to the individual just compensation, and this should not be withheld.

The writ of injunction is to except from its operation any interference with the performance by the defendant of its contract with the United States and its entering into like further contracts. The decree for an accounting by the defendant may be made to secure the plaintiff in all its rights. The form of a decree, in accordance herewith, may be submitted.

We have accompanied this opinion with special findings of fact and of law. These meet the defensive propositions advanced by counsel. The industry displayed and energy exhibited in their presentation, however, justify adding perhaps unnecessary length to this opinion in discussing them. The defense is presented as summarized in six propositions. These we have condensed into three, and discuss in a different order from that in which presented. They are: (1) The patent has not been infringed. (2) The patent is invalid. (3) The patent can be infringed with impunity because defendant has contracted with the War Department to infringe it.

## 1. Denial of Infringement.

The defendant itself supplies the swift refutation of its own argument in support of this position. It asserts most earnestly that the defendant is using the device, not of Davis, but of former Captain (now Major) Phillips. It avers just as earnestly that the Davis device is identical with that of Phillips, and therefore anticipated by it. This is suicide. The only fact of difference between the projectile which it is manufacturing and that described in the patent is in the difference between the metal of one possible form of cap which could be made according to the Davis design and that made use of by the defendant. To give even the color of a difference, the assertion is made that the Davis invention consists of a special form of sheet metal cap, and that the defendant is using a metal cap, but not of sheet metal. It is sufficient to observe that the first assertion is unwarranted. The fact of infringement is found. Its denial can scarcely be serious. The only suggestion of a basis for it is in the unsuccessful effort to avoid infringement by the method of cap adjustment.

## 2. Invalidity of Patent.

This objection is multiform. The denial of novelty is one. The argument takes for its text the title given the invention in the specifications "a contour cap for projectiles." If it were true, as asserted, that all Davis did was to design a cap to be fitted over or fastened to the front end of any projectile, there would certainly, in view of the prior state of the art, be no novelty in this, except whatever novelty the special make of cap might possess. Mere assertion, however, does not always prove a fact, and is never an argument. Davis did more

than this. To deny to his design the merit of a combination, as defendant's argument essays to do, is to refuse to follow the very definition of a patentable combination which is approvingly quoted. Most of the elements, indeed it may be said all the elements, except the idea of the combination itself, may be said to be old. Herein, however, lies the novelty, as well as the utility, and the consequent merit of what was accomplished. Hence also its patentability. The aggregated elements were contour of flight, penetrating shape, supporting nose, hollow cap, and projectile proper. Merely putting together these old elements produces at most only the aggregated functions of them all. Bringing them into the contact of a mere aggregation may indeed destroy the operation of some of the elements considered separately, but the aggregated result can be no more than the sum of all. Its fullest product is a mathematical addition. A true combination produces a new and different, at least in the sense of an additional, result. A product springs from the manner in which the elements are brought together, which is not present in all of them, considered as the mere sum of separate units. The result is one of multiplication or of the addition, plus something else. Every true combination, however, has its key. Every arrangement of separate blocks which form an arch possesses always a keystone and sometimes cement. The Davis device uses these old elements in a novel combination. Not only were these elements, taken separately, old, but the idea of a combination was itself old. To these attempted combinations reference has already been made. The failure of each consisted in the loss of function which the elements separately had. The flight function was retained. The ballistic quality was lost. The device which expanded the soft metal nose of the projectile into a huge proboscis, having the flight contour, doubtless failed because the massing of the metal in front of the point destroyed its supporting function by crowding the metal which surrounded the point, thus destroying its "radial inertia." The hollow cap device failed because there was no nose to the projectile point; this feature having been dropped out of the combination, and the metal of the cap itself not serving, as it was expected to do, as a substitute for the nose. The change from ductile to frangible metal in the solid and hollowed tip was also barren of results. The thought which saved the day was the simple one of combining with the other elements, not the hollowed cap with the naked point of the projectile proper, but with the nose as well as point. It is the simplicity of the combination which makes it look like a mere aggregation.

Right here is the high-water mark of the argument for the defense. A standard projectile, at the time of the Davis device, might well be considered as one with a soft nose incasing a sharp point. A hollow contour cap was part of the then art. To merely cover the one with the other is an idea so simple as to seem a mere aggregation. In the simplicity of a device may, however, consist its chief merit. It may well be a case of "the simplest is the best." Right here must be kept in mind another feature of the condition of the then art. No successful completed projectile was known. The army and navy

experts had applied themselves to the task of doing just what Davis has done—to find the proper combination. We cannot therefore deny it to have the merit of novelty as well as value, although it doubtless deserves the criticism directed against it by defendant of not making any great call upon the inventive faculties. The patent laws extend the promise of reward, however, to the exercise of the humblest talents, as well as to inventive genius. The only toll it exacts is that the product shall possess inventive merit. The criticism of the findings and reasoning of the examiner is not, however, well based. In the claims which he allowed, and in those which he held to be too broad, he showed discriminating judgment. The prior art disclosed a cavity cap, into which the naked point of the projectile penetrated. It was able to show a projectile proper, in which the point was behind and surrounded with soft metal. It possessed no projectile as a whole in which there was interposed soft metal between the point and the cavity. In consequence, the examiner allowed claims for the last and disallowed those for the first. He disallowed also the claims for devices in which the soft metal was around but not in front of the point. This was because here, as in the devices then already patented, the point projected into, or at least met, the cavity.

This brings us to the defense of anticipation, so far as involved in the state of the art before the Phillips design. This is best presented in the Hadfield patent. The strength of the argument lies in this: In the Hadfield device, as in the Davis design, the essential idea was to surmount the projectile designed for penetration with a hollow cap, which would transform the projectile as a whole into one having the qualities of prolonged flight. The then prior state of the art as to the ballistic form of projectiles must be remembered. The sharp point form of projectile had not as yet been adopted. Hadfield dealt with the projectile proper as it was. It is within the limits of fair surmise that, had the pointed form with the soft metal nose been then in use, his design would have incorporated it. In this lurks the only doubt in the way of a finding that the Davis idea had not been anticipated. Although, however, Hadfield might have incorporated the sharp point feature, had it then been known, he in fact did not. He might also have overlooked the combination of nose and point, as did those who first followed him. He might also have extended his design by first discovering the merits of the sharp point feature and then incorporating it with the others. Here again, however, he did not. The possibility of what he might have done does not detract from what Davis did.

This brings us chronologically to the Phillips, Wheeler and McKenna, and the Davis idea. The fact that they all were in quest of this idea, and that they independently, though successively, found it, shows two things: First, the prior art was short in accomplishment. Second, the idea, although perhaps easy to find, had the value which they at once and all now recognize it to have. The Wheeler and McKenna discovery is disposed of by the statement of the admitted fact that it was after that of Davis. Phillips was ahead of Davis in

point of time, but of this there are these things to be said. In the first place, it is by no means certain that Phillips had conceived the Davis thought. How far the peculiar feature of having lubricating openings through the soft nose absorbed his whole thought, we cannot be sure. The Davis idea was, however, there whether Phillips was consciously alert to its presence or not, and this would doubtless constitute anticipation. In the second place, no one, so far as this record discloses, knows whether the Phillips design would have justified itself in practice. It has never been tried. The chief of ordnance doubted it, and the fact that it was not tried indicates that its promise of success was not inviting. The presence of the large number of lubricating perforations justifies the criticism of counsel for plaintiff of the possible, although lurking, danger of an undue weakening of the point support. In the third place, and this most concerns us, the Phillips design was never reduced to practice. The argument of defendant in the line of the facts showing it to have been in the course of practical application, although stretched to undue length, falls short of reaching convincement. The Phillips idea never progressed beyond the incubating stage. As it likewise was never the subject of printed publication, it does not detract from the legal deserts of the Davis invention, unless the latter was pirated. Suspicion, prompted and pointed by self-interest, might suggest the charge, but there is absolutely nothing to justify such a finding. We pass the charge of lack of utility with the observation that defects in mechanical construction or in the material of construction do not show absence of merit in an invention.

### 3. Governmental Use.

A brief reference to the final stand of the defense will conclude its consideration. Whether governmental use should be excepted from the exclusive proprietary rights given to the patentees is a policy for the consideration of Congress, not of the courts. The argument based upon the ruling in Crozier v. Krupp, 224 U. S. 290, 32 Sup. Ct. 488, 56 L. Ed. 771, ignores the distinction that the right of action given by the act of 1910 against the government does not grant immunity to any private trespasser upon the rights of patentees. The Bethlehem Steel Company, and not the United States, is the defendant here, and to say that, because of the government use of these projectiles, the plaintiff is deprived of a remedy for wrongs done it is to confuse the power to issue writs of injunction with the exercise of the discretion of the courts in their issue. The distinction also between legal rights and particular forms of remedy, legal or equitable, should not be lost sight of. We cannot too clearly keep before us the thought that equitable relief is always of grace and never of right, unless given by act of Congress, as well as the thought that all legal rights are to be kept inviolate. The plaintiff can be accorded its full legal rights without in any way interfering with the work of the army or the navy. To attempt the latter would be an act of manifest folly. The decree allowed meets this view of the case.

## Findings of Fact.

The court finds the following facts:

(1) The plaintiff is the owner by assignment of the rights of the patentee in letters patent No. 945,492, issued January 4, 1910, on an application filed April 21, 1908.

(2) The patent was allowed by the Patent Office after hearing and argument, in which all the points of defense now raised were heard. Neither the United States nor the defendant were parties to this hearing or proceeding, and the existence of a description by Captain (now Major) Phillips of a similar form of projectiles was not known to the Patent Office.

(3) Captain (now Major) William A. Phillips, of the Ordnance Bureau of the War Department, devised and designed a projectile, and on May 4, 1907, put his ideas in the form of and incorporated them in a drawing. They were never put in practice, however, nor embodied in the concrete form of a projectile, nor were they ever made public. The drawing remained on file with the bureau, but the ideas were never tested by a trial. The patentee received no benefit from and had no knowledge of the Phillips design.

(4) On April 21, 1908, there was, in the state of the prior art, knowledge that a certain contour given to a projectile would prolong its flight by reducing the air resistance and by flattening the trajectory of the projectile. It had been experimentally determined and become known what contour would produce the best results in this respect. The patentee of the patent in suit availed himself of this knowledge and incorporated this contour in his design.

(5) It was likewise known that the ballistic effects of shots were increased by drawing the penetrating end of the projectile to a fine point and incasing this with a relatively soft metal, so as to form a nose for the projectile. The known result was that by this means the integrity of the piercing point was preserved and supported during penetration or the operation was facilitated. This soft metal nose was in use before the marked sharpness of point had become the accepted form of projectile. The observation may be added to this finding that the principle to which this device owed its success was a matter of opinion. The various theories advanced are those enumerated in the opinion filed herewith. The result is doubtless a combined result; all the causes suggested operating to a common end. One essential thing is the lateral support given to the point by the "radial inertia" of the incasing metal around the point being greater than the force of the deflecting tendency and the tensile strength of metal forming the nose of the point, and the latter being so adjusted to the "radial inertia" as that the penetration was well begun before the deflecting force operated.

(6) It was obvious that, to make an effective shot, the projectile must possess the power both of prolonged flight and fullest penetration, and it was known that these properties could be conferred by giving the projectile proper the penetrating shape and inclosing it in the proper contour of flight; these different forms to have such

duration as that the latter would be destroyed when the effectiveness of the former came into operation. What was not known, however, was the means of securing the full benefits of the one without interfering with the effective functioning of the other. The known devices were two. One was to so shape the nose of enveloping soft metal as to give it the contour of greatest flight. This was to make a solid head or projection incasing the point of the projectile. The other was to incase the projectile proper in a metal cap having the desired contour. The general idea expressed by each method was the same. The hood was to answer the double purpose of affording the flight property and give the required ballistic qualities by having both the flight form and being so disposed about the point of the projectile as to function as the metal nose was known to do. Neither device was a success. To make clear this finding and that which follows, some observations upon the causes of these failures are called for. To have the fullest ballistic properties of the projectile evidence themselves, the mark must not only be reached, but the projectile must be moving with the highest possible velocity, and its point must be protected from fracture or deflection when the impact comes. If the solid metal cap was not given the proper form, length and velocity of flight were lost. If this form were preserved, it could be done only at the cost of interposing a mass of metal in front of the point of the projectile. This mass of metal would not function as did a mere nose of soft metal disposed about the point. The support of the point is required to be a lateral support. This support must come from the radial inertia of the metal immediately around the point. The effect of massing metal in front was to destroy the radial inertia of the metal around the point by crowding. Disposing the metal of this solid cap differently changed the radius of the head, and this was found to lessen the penetrating effectiveness of the projectile. The difficulties of the problem were increased by the fact that the cavity provided for explosives weakened the head at the section of maximum strain, unless the orthodox radius of the head was preserved. The simple cap device was also a failure. This was due to the fact that it was either destroyed before impact, because the inertia of the cap caused it to be pierced by the point of the projectile, or, if preserved, the metal of which it was composed would not function as would the soft metal nose. The substitution of frangible for ductile metal was found not to be a help but a detriment.

(7) After and because of the discovery made by this patentee, it became known that, by incorporating in the previously made devices, and combining with the elements already present, the feature of an air space or cavity in the cap, the greatest flight and ballistic properties of the projectile were both preserved, and the former design was changed from a failure into an assured and accepted success. The salient feature of these successful caps is this cavity or air space in front of the soft metal nose given the projectile. The space in front of the nose of the projectile may be wholly empty or filled or partially filled for weight or otherwise without impairing the efficiency of the cap, if the filling is easily penetrable.

(8) The novelty and utility of the design of the patentee consists in the features that there can thereby be manufactured an armor piercing projectile which is an improvement over any which could before be made, giving to the projectile proper increased efficiency; that the projectile thus made possesses the properties of both length of flight and ballistics in greater degree than projectiles before existing, and that these results are accomplished by combining in one projectile, in a manner not before known, the tapering shape or contour which is productive of the greatest length of carry, the sharpness of point required for the greatest power of penetration, coupled with the support of the point, so as to make its sharpness effective by preventing the point from being upset, and such an arrangement and construction of the several parts as that the functioning of the one does not interfere with the efficiency of the others.

(9) The design of the patentee consists of an armor piercing projectile of standard, or any desired type, having any desired cavity for explosives, any desired degree of sharpness to enable it to most readily penetrate, with the point protected and supported in any desired manner to make its power of penetration effective, with the point inclosed in a shell or cap so formed as to give the whole projectile any desired contour to promote length of flight; the shell having a cavity or space in front of the nose of the projectile proper, so that the functioning of the nose construction may not be hampered.

(10) The patentee has invented or discovered a new and useful improvement in armor piercing projectiles not before known or used by others in this country, and not patented or described in any printed publication in this or any foreign country before his invention or discovery thereof, and not in public use or on sale prior to April 21, 1908.

(11) The invention and discovery of the patentee consists of those things set forth in claims 1, 2, 7, 8, 9, 10, and 11 of his application for letters patent, as follows:

"1. The combination of a pointed armor piercing projectile; a soft metal cap surrounding and supporting the point of said projectile; and a contour cap secured to said projectile having a shape adapted to give to the projectile, as a whole, that contour best adapted for piercing the air with the minimum resistance, and said contour cap, when in position on the projectile, leaving a hollow space between its extreme forward point and the forward point of said soft metal cap, substantially as described.

"2. The combination of a pointed armor piercing projectile; a soft metal cap surrounding and supporting the point of said projectile; a conoidal contour cap struck with a radius of substantially six diameters of the projectile; and means for so securing said contour cap to said projectile as to leave a chamber between the front of said soft metal cap and the extreme point of said contour cap, substantially as described."

"7. An armor piercing capped projectile having a sharp nose and a cap surrounding and supporting the nose of the projectile and provided with a chambered fore portion; the lateral faces of said chambered portion being gently convergent forward to approximately a point.

"8. A cap for sharp-pointed armor piercing projectiles having a base portion recessed to receive the tip of a projectile and to support it laterally and adapted to be secured on the tip of the projectile and a chambered front portion extending approximately to a sharp point.

"9. A capped armor piercing projectile, the cap of which has a chamber in

front of the projectile point; the solid portion of the cap being distributed mainly around but not in front of the nose of the projectile.

"10. A cap for a pointed armor piercing shell having a chambered front portion adapted to lie in front of the projectile point and recessed at the rear so as to fit around and laterally support the nose of the projectile; said recess extending nearly through the unchambered portion of the cap.

"11. A cap for pointed armor piercing projectiles having a radius of curvature of substantially six times the diameter of the projectile, and comprising a hollow pointed contour portion and a portion adapted to laterally surround and inclose the projectile point."

(12) The defendant has, since the grant of letters patent owned by plaintiff, made and sold improved armor piercing projectiles substantially identical with the projectile covered by said patent, and has infringed the same.

## Conclusions of Law.

The court finds the following conclusions of law:

(1) Letters patent, No. 945,492, are valid, and the plaintiff has, and since March 9, 1910, has had, the sole and exclusive right to make use and vend the improved armor piercing projectiles described in claims 1, 2, 7, 8, 9, 10, and 11 of the application for said letters patent.

(2) The defendant has infringed upon said right of the plaintiff by making and vending projectiles, and is guilty of an infringement of said patent.

(3) The plaintiff is entitled to a decree for an accounting for profits.

(4) The plaintiff is entitled to. a decree allowing a writ of injunction, excepting from the operation thereof all dealings between the United States of America and said defendant.

(5) The plaintiff is entitled to a decree for its damages.

(6) The plaintiff is entitled to a decree for costs.